IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 29, 2014

**STATE OF TENNESSEE v. ROBERT E. ODLE**

**Appeal from the Circuit Court for Wayne County**
**No. 15236      Jim T. Hamilton, Judge**

**No. M2014-00349-CCA-R3-CD - Filed November 21, 2014**

Appellant, Robert E. Odle, was convicted of aggravated arson and sentenced to fifteen years in the Tennessee Department of Correction. On appeal, he claims that he proved by clear and convincing evidence that he was insane at the time of the offense and that, therefore, this court should reverse his conviction. Following our careful review of the record, the applicable law, and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR.,. JJ., joined.

Claudia S. Jack, District Public Defender, Columbia, Tennessee; and Robert H. Stovall, Jr., Assistant District Public Defender, Pulaski, Tennessee, for the appellant, Robert E. Odle.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Joel Douglas Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts

Appellant was indicted by a Wayne County grand jury for aggravated arson after he set fire to the house of his brother, Charles Odle. Appellant admitted his involvement but asserted the affirmative defense of insanity. The jury rejected the insanity defense and convicted him as charged. The trial court sentenced appellant to fifteen years in the Tennessee Department of Correction.

At appellant's trial, Wayne County Sheriff's Deputy Patrick Dustin Malugent testified that he responded to a house fire on Collinwood Highway on April 11, 2012. When he arrived, the victim's house was fully engulfed in flames. Deputy Malugent learned that the victim had been inside when the fire began but escaped unharmed. Deputy Malugent did not see appellant in the area at the time. He returned "a couple hours later" and "made contact" with appellant at appellant's trailer, which was next door to the victim's house. Deputy Malugent asked appellant if he had seen the fire, and appellant responded, "'I set it.'" Deputy Malugent testified that he immediately informed appellant of his constitutional rights and transported appellant to the sheriff's office, where appellant gave a statement. Deputy Malugent read the statement aloud:

> It boiled down to me and my brother and my sister. Every time my mama's flowers would come up, he, Charles, would cut it down[,] and we had been arguing about it for a long time. Today they had Sandy Newman come and mow the yard and I ran him off.
> . . . .
> [In response to being asked what he did during the fire:] I knew, he, Charles, was in the house and I took a hammer and started beating on the side of the house, and told him to get out. And I stood there to make sure he got out.
> . . . .
> [In response to being asked how he started the fire:] I poured gas out of a can on to toilet paper, on the back porch, and threw a match on it.

Appellant told Deputy Malugent that he did not intend to hurt his brother and that his reason for setting the fire was that he was "tired of him cutting down everything that I plant."

Deputy Malugent testified that he had no problem communicating with appellant. Appellant appeared to understand his questions, and he gave intelligent answers. Deputy Malugent said that he did not feel that it was necessary to call in the mental health response team.

On cross-examination, Deputy Malugent said that he was not aware of previous calls to the sheriff's office regarding appellant. Deputy Malugent agreed that he had noticed during appellant's time at the jail that appellant had involuntary movements, but he said that he could not recall whether appellant exhibited similar involuntary movements the day of the fire. Counsel played a video recording of appellant's arrest, taken from the dashboard camera of a patrol car, and Deputy Malugent agreed that appellant made "strange body movements" in the recording. He disagreed that appellant almost fell or that his speech was slurred. Deputy Malugent said that he did not know anything about Huntington's disease.

-2-

The victim testified that his house was approximately 200 feet from appellant's trailer. They had not communicated with each other for two years prior to the fire. On the day of the fire, the victim heard a noise and saw appellant in his back yard. Twenty minutes later, he heard a "funny noise" and discovered that his porch was burning. He tried to call for help, but his telephone was not working. The victim said that he grabbed what he could and left to find help. When he exited the house, he saw appellant standing thirty to forty feet away.

On cross-examination, the victim testified that he believed appellant's having Huntington's disease affected his mind. He said that in the few years before the fire, appellant cut the victim's water lines, disconnected his cable lines, and turned off his gas.

David Ray Parham testified that the victim and appellant were his uncles. He lived across the street from them. Mr. Parham recalled that in 2011, appellant told him that he was going to "'put a bullet between [the victim's] eyes.'" When Mr. Parham said, "'[D]on't you know you'll go to prison for that,'" appellant replied, "'Well, I'll just burn him down then.'" Mr. Parham agreed that appellant lived on his own and was able to care for himself at that time.

On cross-examination, Mr. Parham testified that he had seen appellant pointing at the sky and talking to it. He said that he noticed appellant's mind slipping in 2010 or 2011. Mr. Parham stated that on the day of the fire, he thought that appellant was "[k]ind of wacko" because appellant "ran off" someone who had come to mow his yard.

Wilford Carlos Hamm, a special agent with the fire marshal's bomb and arson section, testified that the victim's home was "totally destroyed." He testified that he examined a small section of wall that had been somewhat protected from the fire. The wall was more damaged on the outside than inside, "suggest[ing] that the fire was on the outside of the house."

Fannie Lou Parham, the sister of the victim and appellant, testified that she lived across the street from her brothers. She recalled that the morning of the fire, appellant called her and asked, "'[W]hat in the H is going on?'"[1] When she responded that someone was coming to mow their yards, appellant said, "'G.D. big deal,'" and hung up. Ms. Parham said that three months to one year before the fire, appellant told the victim, "'I'm going to kill you; I'm going to shoot you; I'm going to knock you in the head.'" Over one year before the fire, appellant told Ms. Parham that "he was going to catch [the victim] asleep, and burn him up in his house."

---

[1] Ms. Parham apparently self-edited appellant's comments.

On cross-examination, Ms. Parham agreed that in April 2010, she called "dispatch . . . saying [appellant] was nuts, and that he turned the gas off." She recalled that two to three years prior to trial, appellant "started not walking straight[] and doing odd things." She agreed that these were symptoms of Huntington's disease. Ms. Parham stated, "I think his mind has been eaten away, because of the disease." She recalled seeing him talking to the sky seven or eight times.

Following Ms. Parham's testimony, the State rested its case. On behalf of appellant, Ella Medley testified that she was a nurse at the Wayne County Jail and had cared for appellant for the three months prior to trial. She said that appellant had Huntington's disease, which affected his motor skills. Ms. Medley said that appellant hallucinated and was very disoriented. She explained that appellant reported seeing "bad things" and would say that he did not "know what they're gonna do to him." She had heard him yell, "'[G]et away from me[.] [W]ho are you?'" Ms. Medley testified that appellant was in a cell by himself.

Dr. Hilary Linder, a psychiatrist at Western Mental Health Institute ("WMHI"), testified that prior to trial, appellant was at WMHI for a thirty-day mental evaluation. Dr. Linder met with appellant once a week for twenty to thirty minutes each time. In evaluating appellant, Dr. Linder received input from staff psychologists, nurses, and psychiatric technicians who all observed appellant during his thirty-day evaluation. Dr. Linder also noted that appellant was examined by a neurologist who confirmed that appellant had Huntington's disease. Dr. Linder testified that Huntington's disease causes a person to exhibit abnormal movements and influences a person's thinking and behavior. He further testified that appellant was "impulsive and very rigid in his personality and his thinking." Dr. Linder continued, "And he []tends to be somewhat intolerant of people and has temper outbursts that are hard to explain on a rational basis." Dr. Linder opined that appellant was suffering from a severe mental defect at the time of the fire. He stated that appellant

> seemed to understand that legally, you're not supposed to set fire to somebody's house. Be he's -- it's a reason that, in his case, in this particular case, it was a necessary thing for him to do. Then he explained it, you know; he said, he did it because he needed for -- he calls his brother Ernie -- and he wanted him to go into the nursing home. And he said, you can't reason with Ernie. That was the reason he set the fire. You know, it didn't make good sense at all. . . . [H]e knew that it was unusual and not an every day thing to do. But he still thought he made the right choice.

Dr. Suzanne Tuseth, a psychologist at WMHI, testified that as part of appellant's evaluation, she and others on her team conducted interviews with appellant's family members and other people who had come in contact with appellant, such as the arresting

-4-

officer in this case. They also reviewed appellant's medical records. Dr. Tuseth testified that the information they received "seemed to support the diagnoses of personality change due to serious mental condition[,] which was Huntington's disease." She further testified that appellant was diagnosed with "Cognitive Disorder NOS." Dr. Tuseth stated that the evaluation team "believed that [appellant] did understand . . . the nature of his acts but[] that he did not have full appreciation of the wrongfulness of his acts." She explained that appellant knew he was burning down his brother's house but that, while "he understood that the action itself was legally wrong," he did not appreciate the moral wrongfulness of his actions. Dr. Tuseth stated that appellant "had the opinion that[] what he did was wrong" but that he justified his actions by saying that the victim needed his help. When asked whether appellant was "capable of conforming his conduct to the law," Dr. Tuseth replied, "Suffering from the illness that he has, I don't believe that he was." She explained that "the symptoms that go along with personality change due to Huntington's disease [are] impulsivity, rage, and aggression that far exceeds any known stresser." The defense rested its case following Dr. Tuseth's testimony.

The jury found appellant guilty of aggravated arson. The trial court sentenced appellant to fifteen years in the Tennessee Department of Correction. It is from this judgment that appellant now appeals.

## II. Analysis

On appeal, appellant contends that he proved the defense of insanity by clear and convincing evidence[2] and asks this court to reverse his conviction. The State responds that the jury appropriately rejected appellant's defense of insanity.

Tennessee Code Annotated section 39-11-501 sets forth the affirmative defense of insanity:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

---

[2] Appellant framed his appellate argument as a sufficiency of the evidence question; however, the appellate standard of review for sufficiency is similar but not identical to the reasonableness standard adopted by our supreme court for review of a jury's rejection of the insanity defense. *See State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002).

(b) As used in this section, mental disease or defect does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

When a jury rejects the insanity defense, appellate courts may only reverse the jury's decision when, viewing the evidence in the light most favorable to the State, "no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 551 (quoting *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)). The jury may consider lay and expert testimony, as well as evidence of the defendant's words and actions "at or near the time of the offense." *Id.* at 554 (citations omitted). "While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested." *Id.* at 556. The trier of fact's credibility determinations, resolution of factual disputes, and weighing of the evidence will not be reevaluated by this court. *Id.* at 554.

In this case, appellant maintains that while he understood that his acts were legally wrong, the expert testimony proved that he did not understand the moral wrongfulness of his actions. Appellant correctly contends that he only had to prove either that he was unable to appreciate the nature of his actions or that he was unable to appreciate the wrongfulness of his actions. However, he has conflated "nature" and "wrongfulness" by arguing that appreciation of the legal wrongfulness of his actions falls under the "nature" category. In this case, Dr. Tuseth testified that appellant understood the nature of his actions — that he was burning his brother's house. Both Dr. Linder and Dr. Tuseth testified that appellant understood that his actions were *legally* wrong but not *morally* wrong. However, our law does not distinguish between legal and moral wrongfulness. *See State v. Hank Wise*, No. M2012-02520-CCA-R3-CD, 2014 WL 992102, at *16 (Tenn. Crim. App. March 13, 2014), *perm. app. denied* (Tenn. Sept. 19, 2014) (citing *Brian Val Kelley v. State*, No. M2004-01158-CCA-R3-PC, 2005 WL 2255854, at *7 (Tenn. Crim. App. Sept. 15, 2005); *State v. Brian Val Kelley*, No. M2001-00461-CCA-R3-CD, 2002 WL 927610, at *25-26 (Tenn. Crim. App. May 7, 2002)). Thus, viewing the evidence in the light most favorable to the State, we conclude that the trier of fact reasonably rejected appellant's insanity defense when appellant's experts testified that he understood that his actions were legally wrong. Accordingly, we affirm the judgment of the trial court.

## CONCLUSION

Based on the record, the applicable law, and the arguments of the parties, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE